***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Houser. Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the award, except for minor modifications, the Full Commission AFFIRMS and ADOPTS the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement marked at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to the jurisdiction of the North Carolina Industrial Commission.
2. An employee-employer relationship existed between the plaintiff-employee and defendant-employer on April 21, 2000 and April 22, 2000.
3. Mr. Danny Sley Whitley, defendant-employer, was insured by Key Benefit Services at all relevant times herein.
4. The average weekly wage of plaintiff at the time of the incident giving rise to this claim was $534.87, which yields a compensation rate of $356.60.
5. Plaintiff was paid temporary total disability benefits from April 22, 2000 through July 10, 2000 pursuant to an Industrial Commission Form 63. Benefits were terminated pursuant to an Industrial Commission Form 61, filed August 17, 2000, after receiving a thirty day (30) extension from the Industrial Commission pursuant to N.C.G.S. § 97-18(d).
6. At the deputy commissioner hearing, the parties submitted a Packet of Medical Records, which was admitted into the record and marked as Stipulated Exhibit (2) and an Industrial Commission Form 61, Form 63 and Order, which were admitted into the record and marked collectively as Stipulated Exhibit (3).
7. The depositions of Mr. William S. Best, Mr. Daniel C. Smith, and Texas Highway Patrolman Jeff Vajdos are a part of the evidentiary record in this matter.
 ***********
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
 FINDINGS OF FACT
1. On April 21, 2000, the date of the incident giving rise to this claim, plaintiff was thirty-eight (38) years old and was employed by defendant-employer Danny Sley Whitley as a truck driver. Plaintiff has completed his GED and has been continuously employed as a truck driver since entering the work force.
2. On April 19, 2000, plaintiff departed Wilson, North Carolina on a trip for defendant-employer to deliver goods to San Antonio, Texas. Plaintiff arrived in San Antonio in the morning hours of April 21, 2000 and was scheduled to make the delivery the next morning on April 22, 2000. Due to the scheduled time of his delivery, plaintiff remained at a truck stop in San Antonio for over twenty-four (24) hours prior to proceeding to his destination.
3. Prior to this trip, the truck plaintiff was driving for defendant-employer had been involved in an accident that damaged the right fuel tank, which was removed for repairs. As a result, for the trip at issue, plaintiff had only one fuel tank remaining and did not have an accurate fuel gauge.
4. Due to not having an accurate fuel gauge, plaintiff stopped to refuel more often than usual and manually checked the amount of fuel remaining in the left side tank. Due to the non-flammable nature of diesel fuel, it is not uncommon for truckers to manually check fuel levels at night by holding a lighter in the tank so that the level can be visually determined. Plaintiff and defendant-employer had checked fuel levels in this manner on previous occasions.
5. Prior to arriving in San Antonio, plaintiff filled up with fuel in Baytown, Texas, which is approximately three hours from San Antonio. Plaintiff alleges, and testified as such, that in the late evening hours of April 21, 2000 or in the early morning hours of the April 22, 2000, he decided to check his fuel level to determine whether he needed to take on additional fuel. Plaintiff testified that while he was in the process of checking the fuel level that he lowered a lit lighter into the tank. Plaintiff further testified that he noticed something metal in the bottom of the tank and that there was an explosion or ignition of the fuel. Plaintiff then allegedly used a towel to wrap his head and extinguish the fire.
6. According to plaintiff's testimony, after the fire was extinguished, he took photographs of his face, head, neck and upper chest. These photographs, which were admitted into the record as Plaintiff's Exhibit (2), show visually the condition of these areas on plaintiff's body. Stipulated medical records from April 22, 2000 do reflect that plaintiff sustained severe burns to his neck, face and upper chest.
7. After sustaining these burns, according to plaintiff's testimony, he refueled his truck at another truck stop at approximately 3:30 a.m. The time of this refueling is documented in Defendants' Exhibit (5). Plaintiff contends that he then proceeded to the warehouse facility to make his delivery at approximately 6:00 a.m. on April 22, 2000. A HB Carrier Entry and Departure Form, which was admitted into the record and marked as Defendants' Exhibits (6), documents plaintiff's arrival and departure times.
8. At approximately 9:30 a.m. on April 22, 2000, plaintiff stopped at a truck stop, spoke with the attendant and requested an ambulance. That plaintiff spoke with a truck stop attendant at that time was confirmed by Mr. Gary Batten, a private investigator hired by defendants, who traveled to San Antonio to investigate this matter. It is relevant to note that this stop at a truck stop, according to plaintiff's testimony, occurred after he had received his burns and after the completion of his delivery to HB. At the truck stop, plaintiff became impatient with the questions asked by the emergency dispatcher and did not wait for an ambulance, leaving the truck stop without receiving medical attention.
9. After leaving the truck stop, and prior to seeking medical treatment for his severe facial, neck and upper chest burns, plaintiff drove approximately thirty-five (35) miles away from San Antonio. At the hearing, plaintiff explained that he drove this distance despite his injuries because people in San Antonio spoke Spanish, and he did not. While driving, plaintiff came across a Texas State Highway Patrolman who was parked on the side of the road. Plaintiff then stopped his truck and requested assistance from the patrolman. By the time plaintiff reached the emergency room at Guadalupe Valley Hospital, it was 10:20 a.m. on April 22, 2000. Plaintiff was then transferred to Brooks Army Medical Center for additional medical treatment.
10. According to the medical records, plaintiff sustained burns only to his face, neck, upper chest, and ears. A review of the medical records shows no indication of burns to his hands or arms. The medical records further disclosed that an IV was placed in plaintiff's right hand, further indicating that plaintiff did not suffer any type of injury or burn to his hand. At the hearing, however, plaintiff testified that he did sustain burns to his hands. Plaintiff's testimony directly contradicts his earlier recorded statement in which he acknowledged that he did not sustain any injury to any portion of his body other than his face, neck and upper chest. Plaintiff's testimony that he sustained some type of burns to his hands is not accepted by the Full Commission given the overwhelming evidence to the contrary.
11. Mr. Danny Sley Whitley, defendant-employer and owner of the truck, traveled to San Antonio, Texas to secure the truck and trailer after receiving notification of plaintiff's injuries. Prior to moving the truck and trailer, Mr. Whitley obtained a sample of fuel from the fuel tank. That sample was later evaluated by a chemist, Mr. William Best, who found no evidence of gasoline. Mr. Whitley also obtained other items from the truck including the shirt plaintiff was allegedly wearing at the time of the incident, bed linens, beer cans, and a razor blade and a mirror.
12. Mr. Daniel Smith, a mechanical engineer and accident reconstruction expert, was of the opinion that it would be highly unlikely for diesel fuel to explode or ignite under the circumstances as described by plaintiff. Diesel fuel must be heated to a temperature of at least one-hundred and ten (110) degrees before vapors which are necessary for it to ignite are produced. The temperature in San Antonio at the time of this incident as alleged by plaintiff was between sixty-one and sixty-five (61-65) degrees Fahrenheit.
13. At the deputy commissioner hearing of this matter, plaintiff raised as a possibility that there may have been gasoline mixed in with the diesel fuel as an explanation for his version of the incident. However, Mr. Smith opined without equivocation that if there was any substance mixed in with the diesel fuel such as gasoline, it would have dissipated well before plaintiff opened the fuel tank due to the time the truck had been driven and idled. Mr. Smith further opined that had gasoline been in the fuel tank that it would have affected the operation of the diesel engine. There was no evidence offered that the diesel engine was operating improperly in this case. Accordingly, plaintiff's testimony regarding the possibility of gasoline being in the fuel tank is given no weight by the Full Commission.
14. Mr. Smith also testified regarding the pattern of plaintiff's burns. In order for plaintiff to have received burns to his face, neck and upper chest, and ears in the manner he alleges, he would also have sustained burns to his right hand and arm. This is so because if there were fumes in the area of plaintiff's face at the time of the ignition, there would also have been vapors at the source of the ignition and a continuous flow of vapors from that source to the area where plaintiff was burned. Therefore, according to plaintiff's version of the incident, there would have been vapors around his hand when he ignited the lighter and his hand would have sustained burns. As noted, the medical records do not reflect any burns to plaintiff's right hand and Mr. Smith opined that based upon plaintiff's burn pattern, the accident could not have happened in the manner plaintiff has described.
15. Additionally, on the issue of burn patterns, diesel vapors are heavier than air and once released from the tank, the bulk of the vapors would have flowed downward towards the ground rather than upwards towards plaintiff's face. The dissipation of vapors would have been uniform so that the burns sustained by plaintiff would have been in a uniform pattern, primarily around his waist and below. However, the pattern of burns sustained by plaintiff was spotty, not uniform.
16. According to the expert testimony from Mr. Smith, the speed of an ignition is such that the employee would not have had time to react and shut his eyes, which would have likely resulted in damage to the eye itself. According to the medical evidence, plaintiff sustained no burn damage to his eyes.
17. Mr. Smith was of the opinion that plaintiff's burn patterns were consistent with having been sprayed in the face with some type of chemical and then having that chemical ignited. This would explain the accumulation of vapors around plaintiff's head, face and neck and upper chest, and the absence of any burns on plaintiff's hands.
18. Plaintiff has offered four different versions of the events leading up to the alleged incident giving rise to his burns. At the deputy commissioner hearing of this matter, plaintiff testified that when he opened the tank, he saw something metallic loose in the bottom of the fuel tank. According to plaintiff, after seeing this metal object, he struck his lighter and then the ignition occurred. However, in an earlier recorded statement, plaintiff indicated that he was using a measuring stick to measure the fuel level, that he had dropped the measuring stick into the fuel tank and that he then struck a lighter to locate the measuring stick. In his deposition, Texas State Trooper Vajdos confirmed that plaintiff reported to him that he dropped a measuring stick inside the fuel tank prior to the fire. It must be noted that any measuring stick long enough to measure the fuel level in the tank would have been long enough to reach the bottom of the tank from the top of the tank and would be extremely difficult, if not impossible, to drop into the tank as plaintiff previously described. A third version was offered in plaintiff's interrogatory responses, in which plaintiff claimed that that he was trying to check his fuel level with a penlight, but dropped the penlight into the tank. He then struck the lighter to see if he could find the light and the ignition occurred. There is no mention in this description of any measuring stick or any loose substance in the fuel tank. Finally, to Ms. Nancy Holdsclaw, a Medical Case Manager, plaintiff reported that he was using a stick to measure the fuel level when he dropped the stick underneath the door of the truck. Plaintiff then allegedly struck his lighter and the ignition occurred.
19. Ms. Holdsclaw also testified regarding a report concerning other details of the incident as described to her by plaintiff. Plaintiff informed Ms. Holdsclaw that the truck door was open at the time the explosion occurred. However, as evidenced by the photographs offered into evidence, there were no burns in the fabric of the interior of the truck. Furthermore, there was no discernable fire or burn damage to the fuel tank purportedly involved.
20. No witnesses who testified corroborated the incident as described by plaintiff and, in fact, the credible evidence of record supports a finding that plaintiff's burns were sustained in a manner other than as he has described. Furthermore, in his investigation of this case in Texas, Mr. Batten was unable to locate any individual who had any firsthand knowledge of the incident.
21. During the evidentiary hearing, Deputy Commissioner Houser questioned plaintiff regarding the timing of events as he alleged. On direct, plaintiff testified that he delivered his load to HB after the incident which caused the severe burns to his face, neck and upper chest had occurred. In response to Deputy Commissioner Houser's questions, plaintiff confirmed that the photographs in Plaintiff's Exhibit (2) were taken immediately after the incident, but before he arrived at HB, with a safety camera located in the truck and that the photographs accurately represent his condition at that time. After arriving at HB, it is undisputed that plaintiff interacted with others during the period in which his truck was unloaded. Nevertheless, even assuming his version of events is accepted and that he appeared to others at HB as he appears in these photographs, plaintiff testified that no one with whom he interacted at HB offered assistance, medical or otherwise, nor did anyone inquire as to what had occurred to cause him to appear as he does in Plaintiff's Exhibit (2).
22. Plaintiff is not credible and failed to prove by the greater weight of the competent evidence that he sustained an injury by accident on April 21, 2000 or April 22, 2000.
 ***********
Based upon the findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff's burns were not the result of any injury by accident sustained on April 21, 2000 or April 22, 2000. N.C.G.S. § 97-2(6).
2. Plaintiff's claim, therefore, is not compensable under the provisions of the North Carolina Workers' Compensation Act. N.C.G.S. § 97-2(6).
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
 ORDER
1. Plaintiff's claim under the Workers' Compensation Act must be and is hereby DENIED.
2. Each side shall bear its own costs.
This the ___ day of July 2002.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER